## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| GLENDA D. ONEZINE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-07-2365 |
| | § | |
| MICHAEL ASTRUE, Commissioner | § | |
| of Social Security, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #5). Cross-motions for summary judgment have been filed by Plaintiff Glenda D. Onezine ("Plaintiff," "Onezine") and Defendant Michael Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #15; Defendant's Cross-Motion for Summary Judgment, Docket Entry #11; Brief in Support of Defendant's Cross-Motion for Summary Judgment ["Defendant's Motion"], Docket Entry #12). The Commissioner also filed a response to Plaintiff's Motion. (Defendant's Reply Brief in Response to Plaintiff's Cross-Motion for Summary Judgment ["Defendant's Response"], Docket Entry #16). After considering the pleadings, the evidence submitted, and the applicable law, it is RECOMMENDED that Defendant's motion be GRANTED, and that Plaintiff's motion be DENIED.

**Background**

On May 11, 2004, Plaintiff Glenda Onezine filed an application for Social Security Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act ("the Act"). (Transcript ["Tr."] at 82). In her application, Plaintiff claimed that she had been unable to work since August 7, 2003, as a result of back and neck pain, high blood pressure, obesity, and depression. (Tr. at 82, 16). The SSA denied Plaintiff's application on July 22, 2004, finding that she is not disabled under the Act. (Tr. at 44, 46-50). Plaintiff petitioned for a reconsideration of that decision, but, on November 9, 2004, after considering additional medical records, the SSA affirmed its earlier decision to deny her benefits. (Tr. at 45, 52-55).

On November 15, 2004, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. at 58). That hearing, before ALJ William Howard, took place on April 12, 2006. (Tr. at 294). Plaintiff appeared with her attorney, Paul Burkhalter, and she testified on her own behalf. (Tr. at 14, 294). The ALJ also heard testimony from Susan Rapant, a vocational expert witness. (*Id.*).

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1. An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.      An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.      If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). It is well settled that, under this analysis, Onezine has the burden to prove any disability that is relevant to the first four steps. *See Wren*, 925 F.2d at 125. If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy. *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125. "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)). An individual claiming disability insurance benefits under the Act has the burden to prove that she suffers from a disability. *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). Under the Act, a claimant is deemed disabled only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

3

impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). "Substantial gainful activity" is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452. A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that Onezine has degenerative disk disease, "trigger finger of the nondominant hand," hypertension, obesity, and depression. (Tr. at 16). He also addressed Onezine's complaints that she suffers from neck pain, but found that there was insufficient objective evidence to show that any neck pain "rise[s] to the level of a severe impairment." (Tr. at 17). Although he determined that the other impairments, alone and in combination, are severe, he concluded, ultimately, that they do not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations. (Tr. at 16-17). Next, the ALJ found that Onezine was unable to perform her past relevant work as a home healthcare provider and as an instructor for a nursing aide education program. (Tr. at 20). However, he determined that she

4

does have "the residual functional capacity to perform a wide range of work at the light exertional level," including work as an office helper, an office cleaner, or a "companion," as defined by the United States Labor Department's Dictionary of Occupational Titles ("DOT"). (Tr. at 17, 21).  The ALJ concluded that Onezine "has not been under a 'disability,' as defined in the Social Security Act, from August 7, 2003[,] through the date of this decision."  (Tr. at 21). With that, he denied Onezine's application for disability benefits.  (Tr. at 22).

On July 5, 2006, Plaintiff requested an Appeals Council review of the ALJ's decision. (Tr. at 10).  SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present:  "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest."  20 C.F.R. §§ 404.970 and 416.1470.  On April 28, 2007, the Appeals Council denied Plaintiff's request, finding that no applicable reason for review existed.  (Tr. at 6).  With that ruling, the ALJ's findings became final.   *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).  On July 19, 2007, Onezine filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision.  (Plaintiff's Complaint ["Complaint"], Docket Entry #1).  Having considered the pleadings, the evidence submitted, and the applicable law, it is recommended that Defendant's motion for summary judgment be granted, and that Plaintiff's motion for summary judgment be denied.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal

5

standards were applied. *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). In making this determination, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about her pain; and Plaintiff's educational background, work history, and present age. *See Wren*, 925 F.2d at 126. If no credible evidentiary choices or medical findings support the Commissioner's decision, then a finding of no substantial evidence is proper. *See Johnson*, 864 F.2d at 343.

**Discussion**

Before this court, Plaintiff challenges the ALJ's decision on two grounds. She first argues that the ALJ erred because he did not properly assess her residual functional capacity. (Plaintiff's Motion at 3). In addressing this issue, she also complains that the ALJ's findings are not consistent with the Dictionary of Occupational Titles. (*Id.*). Plaintiff's second argument is that the ALJ erred because he did not follow the law in determining that she was not credible. (*Id.* at 9). Defendant insists, however, that the ALJ properly considered all of the available

evidence, and followed the applicable law, in determining that Plaintiff is not disabled. (Defendant's Motion at 10).

### *Medical Facts, Opinions, and Diagnoses*

Medical records are available from as early as August 8, 2003, when Onezine went to the emergency room at Northeast Medical Center, complaining of lower back pain that began as she was moving a patient. (Tr. at 210-23, 231). Onezine informed the nurse that the back pain radiated down both legs, and she described her pain as a "10" on a scale of one to ten, with ten being the worst. (Tr. at 216). While at the hospital, she was treated by Dr. David Carlyle ("Dr. Carlyle"), a specialist in emergency medicine. (Tr. at 215, 218). Dr. Carlyle advised her that her back pain was the result of a strain of the muscles or ligaments[1] that support her spine. (*Id*.). He prescribed rest, the application of ice or heat, and anti-inflammatory and pain medications. (Tr. at 218-19). Dr. Carlyle also informed Onezine that such injuries may take several weeks to heal, but that "they are usually much better after 2-3 [days]." (Tr. at 218). In his report, Dr. Carlyle described Onezine as "very obese." (Tr. at 215).

The next record, dated August 14, 2003, is from Dr. Gwenevere Williams ("Dr. Williams"), a physical medicine and rehabilitation physician to whom Onezine was referred by the hospital for follow-up care. (Tr. at 220, 231-32). At this appointment, Dr. Williams examined Onezine and found her to be "in no acute distress but . . . in obvious acute pain." (Tr. at 231). She performed a series of tests, and assessed Onezine as suffering from "sudden onset of pain to the neck and lower back associated with radiating pain to the right arm and both lower extremities." (Tr. at 232). She made the following treatment recommendations:

---

[1] A "ligament" is a "flexible band[] of fibrous tissue binding joints together and connecting various bones and cartilages." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 941 (5th ed. 1998).

> 1.)  Outp[atient] physical therapy to the lumbar, sacral and gluteals consisting of hot/cold packs, electrical stimulation, a variety of massage techniques, myofascial release[2] and cryotherapy,[3] daily for three days and three times a week thereafter. Advance to therapeutic exercises as tolerated[.]  2.)  Continue to abstain from work related duties, avoid prolong [sic] standing, sitting, walking or bending. 3.) Continue medicinal regime [prescribed by emergency room physician].

(*Id.*).  Dr. Williams ordered an MRI of Onezine's lumbar spine, which was taken on November 7, 2003.  (Tr. at 230).  The MRI revealed "dis[k] bulging at L3-L4 and L4-5" that "is associated with dis[k] protrusion, causing mild stenosis[4] of the central canal and lateral recesses."  (*Id.*).  Onezine saw Dr. Williams again on July 6, 2004, and on that day she complained of neck, lower back, hip, and leg pain.  (Tr. at 228).  Onezine also reported feeling numbness in her arms, "pins/needles" in her left foot, aches in her back and hips, and muscle spasms.  (*Id.*).  Dr. Williams advised her to seek further pain management treatment from Dr. Jeff Arthur ("Dr. Arthur"), a pain specialist.  (*Id.*).  Onezine returned to Dr. Williams on August 3, 2004, with similar complaints.  (Tr. at 229).  Dr. Williams stated that Onezine's condition appeared to be the same as it had been at their last appointment, and noted that she may need to see a specialist to rule out fibromyalgia.[5]  (*Id.*).  On November 18, 2004, Onezine saw Dr. Williams, again complaining of pain in her neck, lower back, and legs.  (Tr. at 227).  Dr. Williams noted that Onezine's condition appeared to have worsened since their last appointment.  (*Id.*).  She then prescribed Neurontin for Onezine's pain.  (*Id.*).

---

[2] The term "myofascial release" refers to "a group of massage techniques used to relieve soft tissue from the abnormal grip of tight fascia."  *Id.* at 1073.  "Fascia" is "the fibrous connective tissue of the body that may be separated from other specifically organized structures, such as the tendons, the aponeuroses, and the ligaments."  *Id.* at 616.

[3] "Cryotherapy" is "a treatment using cold as a destructive medium."  *Id.* at 423.

[4] "Stenosis" is "an abnormal condition characterized by the constriction or narrowing of an opening or passageway in a body structure."  *Id.* at 1539.

[5] "Fibromyalgia" is "a form of nonarticular rheumatism characterized by musculoskeletal pain, spasm and stiffness, fatigue, and severe sleep disturbance."  *Id.* at 632.

In December, 2003, Onezine began treatment at the Renaissance Northeast Surgery Center ("Renaissance"). (Tr. at 133-203). These records show that on December 11, 2003, Onezine began seeing Dr. Arthur for treatment of "[l]ow back pain with right lower extremity pain." (Tr. at 201). Dr. Arthur found Onezine to be "[a] very pleasant 48-year-old female, alert and oriented times three," weighing 244 pounds, able to heel and toe walk without difficulty, and able to walk without aid. (Tr. at 202). He found that Onezine's motor capabilities were equal in both legs, but that her right leg featured some numbness and pain and rated a positive straight leg raise. (Id.). He also reported that Onezine experienced "some slight low back pain" when she extended her right leg. (Id.). In addition, Dr. Arthur found that Onezine had some tenderness in her lumbar spine at L5 and soreness in her right knee. (Id.). He further found that she had a full range of motion in her hips, but that "there is some pain to the right shin with rotation of the right hip." (Id.). Ultimately, Dr. Arthur diagnosed Onezine as suffering from "[r]ight L5 and S1 radicular symptoms," and he prescribed Neurontin and right lumbar epidural steroid injections to treat her pain. (Id.). Onezine received the first series of epidural steroid injections at Renaissance between December 16 and December 25, 2003. (Tr. at 198). On January 27, 2004, Dr. Arthur found that Onezine's pain had improved by 60%. (Tr. at 208). However, he also noted that she reported that her leg "go[es] out" when she stands for longer than twenty minutes. (Id.). Dr. Arthur prescribed another steroid injection, which Onezine received on February 9, 2004. (Tr. at 156-77, 208). On February 18, 2004, Dr. Arthur again saw Onezine, found a 70% improvement in her pain, and reported that she claimed to be "[d]oing pretty good." (Tr. at 207). Finally, Dr. Arthur prescribed a repeat injection, which Onezine received on March 22, 2004.

(Tr. at 133-76, 207).  Following that procedure, Dr. Arthur reported that Onezine's pain had improved by 75 to 80%.  (Tr. at 206).

On July 14, 2004, Dr. Donald Gibson II ("Dr. Gibson"), an internist, examined Onezine on behalf of the state.  (Tr. at 224-25).  He reported that Onezine suffers from chronic pain in her lower lumbar spine, but had "no radicular symptoms."  (Tr. at 224).  Dr. Gibson found Onezine to be "in no apparent distress," and stated that her back was not tender, that her "[f]orward flexion [was] 90 degrees," and that her "[s]traight leg raise [was] negative."  (Tr. at 225).  He also noted that her gait and coordination were normal, and that she suffered from no "localized sensory loss, muscular weakness, or atrophy."  (Id.).  Dr. Gibson reported that Onezine's x-rays revealed "mild degenerative changes," "no fractures, scoliosis, or spondylosis,[6]" and that she had a normal curvature of the lumbar spine.  (Id.).  Dr. Gibson diagnosed Onezine as suffering from stable hypertension and from back pain resulting from a "[m]ild lumbar strain with minimal degenerative changes."  (Id.).  Further, he stated that Onezine has "[n]o severe limitations to movement or evidence of radiculopathy,[7]" and that she was "able to sit, stand, and walk without difficulty."  (Id.).  On November 4, 2004, also on behalf of the state, Dr. James Wright ("Dr. Wright"), a pain specialist, reviewed and affirmed Dr. Gibson's findings.  (Tr. at 226).  Dr. Wright stated that, based on the record, Onezine's "alleged symptoms/limitations [are] not wholly credible."  (Id.).

From April 22, 2005, through March 15, 2006, Onezine was treated at the Michael E. DeBakey Veterans Affairs Medical Center ("V.A. Medical Center").  (Tr. at 233-93).  On April 22, 2005, Onezine went to the emergency room because she had run out of pain medication and

---

[6] "Spondylosis" is "a condition of the spine characterized by fixation or stiffness of a vertebral joint." *Id.* at 1528.
[7] "Radiculopathy" is "a disease involving a spinal nerve root." *Id.* at 1377.

needed a prescription before she could be seen by her primary care physician.  (Tr. at 280).  At

that visit, Onezine was seen by a physician's assistant, who reported that she had a normal gait,

bilateral S1 tenderness, and a negative straight leg raise.  (*Id.*).  Onezine returned to the V.A.

Medical Center for a "primary care initial evaluation" on July 14, 2005, complaining of "chronic

back pain . . . from neck to low back with bilateral hand nubness [sic]."  (Tr. at 270-79).  In

addition, she reported feelings of depression, weight gain, and insomnia.  (Tr. at 270).  At that

visit, Onezine was treated by Dr. Rola El-Serag ("Dr. El-Serag"), an internist, who found, among

other things, that Plaintiff had no joint deformities or joint pain, no tenderness, and negative

straight leg tests.  (Tr. at 271).  Dr. El-Serag prescribed pain medication and ordered x-rays of

Onezine's neck and back.   (Tr. at 272).   The doctor also prescribed the anti-depressant

medication Celexa, after noting that Onezine had no history of depression.  (*Id.*).  The x-rays

taken of Onezine's cervical and lumbar spine revealed "[s]mall marginal osteophytes,[8]" but "[n]o

evidence of spondylolisthesis.[9]"  (Tr. at 278-79).  The lumbar spine x-ray showed "dis[k] space

narrowing at L5 S1."  (Tr. at 279).  The next relevant record shows that, on September 15, 2005,

Onezine saw Yvonne Vigil ("Ms. Vigil"), a physician's assistant, for a follow-up visit.  (Tr. at

259-64).   At that appointment, Onezine denied experiencing any side effects from her pain

medication, but reported that the Celexa was "making her feel mean and mad in her sleep."  (Tr.

at 259).  Ms. Vigil examined Onezine and found, in relevant part, that she was "in no acute

distress"; that she had a good range of motion in her neck, back, and joints; and that she had no

tenderness on her back.  (Tr. at 260).  Ms. Vigil determined that Onezine should discontinue the

Celexa and begin taking Wellbutrin, another anti-depressant.   (Tr. at 261).   Ms. Vigil also

---

[8] "Osteophytes" are "bony outgrowth[s], usually found around the joint area." *Id.* at 1169.
[9] "Spondylolisthesis" is "the partial forward dislocation of one vertebra over the one below it." *Id.* at 1528.

11

requested that Plaintiff obtain copies of her medical records regarding her back pain.  (*Id.*).
Notably, at that appointment, Onezine told the nurse that her pain was a "5" on a scale of one to
ten.  (Tr. at 263).   On October 24, 2005, Onezine saw Charlotte Friend ("Ms. Friend"), a
registered dietician, for weight management education.  (Tr. at 258).   Ms. Friend identified
Onezine as "morbidly obese." (*Id.*).

On December 1, 2005, also at the V.A. Medical Center, Onezine was evaluated for
depression by Dr. Angela Partida ("Dr. Partida"), a resident in allopathic and osteopathic
medicine.  (Tr. at 249-56).  Dr. Partida was supervised by Dr. Jennie Hall, a psychiatrist.  (Tr. at
249).  At this appointment, Onezine informed Dr. Partida that her depression may have begun in
August, 2003, when she was injured on the job, but that it increased during the past year after an
investigation by Child Protective Services ("CPS") led to the placement of her daughter's
children in her care.  (*Id.*).  Onezine also reported that she was not taking her anti-depressant
medication consistently and that she felt that therapy was not feasible because she must be home
to take care of the children, who were eight years old, six years old, and three months old.  (Tr. at
249-51).  Apparently, Onezine, who is widowed, was taking care of the children by herself, with
some support from her sisters.   (*Id.*).   Onezine denied having suicidal thoughts, and was
characterized as being a "low" risk for suicide.  (Tr. at 251, 254).  Dr. Partida diagnosed Onezine
as suffering from "[major depressive disorder], single episode, moderate," and she prescribed
Wellbutrin, as well as a medication for insomnia.  (Tr. at 255).  On December 15, 2005, Onezine
was seen by Dr. Partida for psychotherapy.  (Tr. at 246-48).   At that appointment, Onezine
reported an improvement in her mood since their last visit and increased activity outside of her
home.  (Tr. at 246).  She told Dr. Partida "that she is more positive and can't wait for 2006 to

start b/c she feels everything will be better in the new year." (*Id.*).  However, at a February 2, 2006, appointment, Onezine informed Dr. Partida that "she has no energy or interest to do anything and spends most of her time at home." (Tr. at 234).  But one month later, after adding the anti-anxiety drug Zoloft to her medication regime, Onezine reported improvement in her mood and increased social activity, although she still felt depressed "on most days." (Tr. at 291).

The V.A. Medical Center records indicate that Onezine went to the emergency room on January 4, 2006, complaining of the following:

> [M]iddle fingers joints hurt/once it is bend [sic] will not straighten out for a week[;] had worsened last night.

(Tr. at 245).  The examining nurse stated that Onezine denied injury to the area, and she noted that Plaintiff's fingers were not swollen, and were warm and intact. (*Id.*).  Onezine was advised to take over-the-counter medication for pain, to apply warm compresses to her fingers, and to exercise them. (*Id.*).  Two weeks later, on January 19, 2006, Onezine saw Ms. Vigil "for an evaluation of pain and swelling on the left hand, middle finger." (Tr. at 237-44).  Ms. Vigil diagnosed Onezine as suffering from "trigger finger,[10]" for which she prescribed an anti-inflammatory medication and referred her to a plastic surgeon. (Tr. at 238).  On the referral sheet, Ms. Vigil clarified that the "trigger finger" was the middle finger of the left hand. (Tr. at 243).  Ms. Vigil also found that Onezine suffers from chronic back and neck pain, but added that those conditions are "fairly well controlled with [N]eurotin." (Tr. at 238).  Finally, Ms. Vigil diagnosed Onezine as being morbidly obese. (*Id.*).

On March 14, 2006, Onezine saw Dr. Adam Bryce Weinfeld ("Dr. Weinfeld"), an allopathic and osteopathic medicine and surgical resident, complaining "of triggering of her

---

[10] "Trigger finger" is "a phenomenon in which the movement of a finger is halted momentarily in flexion or extension and then continues with a jerk." *Id.* at 1653.

13

bilateral long fingers." (Tr. at 287). Dr. Weinfeld ruled out the possibility of carpal tunnel syndrome,[11] and noted that Onezine claimed that the left-hand finger was worse than that on the right. (*Id.*). He also stated that Onezine was able to demonstrate the "locking" on the left hand, only. (*Id.*). Dr. Weinfeld injected both fingers with a steroid medication, and advised Onezine to return if the condition did not improve within one month. (*Id.*). The last records from the V.A. Medical Center are dated March 15, 2006, the day after she received those injections. (Tr. at 282-86). At that visit, Onezine reported that her right hand trigger finger had already "much improved," but that she "still ha[d] some locking of left middle finger." (Tr. at 283). On that date, Dr. Mary Parish ("Dr. Parish"), an internist, performed a physical examination of Onezine, and found "middle finger locking and pain at base of hand." (Tr. at 283-86). Dr. Parish recommended that Onezine keep her appointment with the plastic surgeon, and also diagnosed her as suffering from hyperlipidemia[12] and premenopausal menorrhagia.[13] (Tr. at 284). On that date, Onezine reported that her level of back pain was "4," that her comfort level was "2," and that she found her current pain level to be "acceptable." (Tr. at 286).

### Educational Background, Work History, and Present Age

At the time of the hearing, Onezine was 51 years old, and had completed an associate's degree in liberal arts. (Tr. at 300-01). Onezine's work history includes jobs as a home healthcare provider and as an instructor for a nurse's aide education program. (Tr. at 20, 303, 325).

### Subjective Complaints

---

[11] "Carpal tunnel syndrome" is "a common painful disorder of the wrist and hand, induced by compression on the median nerve between the inelastic carpal ligament and other structures within the carpal tunnel." *Id.* at 279.
[12] The word "hyperlipidemia" refers to "an excess of lipids . . . in the plasma." *Id.* at 791.
[13] "Premenopausal menorrhagia" is "an abnormally heavy or long menstrual period[]" that occurs before the start of menopause, which is the cessation of the menstrual cycle. *Id.* at 1011, 1313.

In her application for benefits, Onezine stated that she is disabled as a result of depression, back and neck pain, hypertension, and obesity. (Tr. at 18, 82). As part of that application, she completed a daily activity questionnaire in which she stated that it takes her longer to do anything than it used to, that she spends most of her time sitting or lying down, and that she has trouble walking. (Tr. at 109). She also reported that she has no difficulty reading newspapers, watching television, or using the telephone. (Tr. at 110). When she made her appeal to the Appeals Council, Onezine stated that her neck was becoming "weaker"; that her left side "continues to be rigid"; and that her arms, hands, and fingers go numb when she holds anything for a prolonged period. (Tr. at 111). Additionally, she stated that she needs help in attending to her personal hygiene, that she cannot brush her hair, that she cannot do any house cleaning, and that she can no longer drive a car. (Tr. at 115).

When she gave her testimony at the hearing, Onezine stood and leaned against the wall. (Tr. at 300). When the ALJ questioned her about this, she stated, "[M]y back is hurting and my neck is beginning to tense up and then that usually lead[s] to muscle spasms." (*Id.*). Onezine testified that she stopped working on August 7, 2003, after she was injured by a patient falling on her. (Tr. at 303). She stated that she went home after the incident, and that, when she awoke the next morning, she "could not move." (*Id.*). She stated that she went to the hospital, and when she was released, she spent a week at a patient care facility until she was able to return home. (Tr. at 303-04). She testified that, at the time of the hearing, she continued to have lower back pain on a daily basis, and described it as follows:

> The pain in my back is . . . a constant, constant throbbing. It's a constant pulling on my legs and my calf constantly hurting or tingling. Then at that point, then it, it just begins to like just radiate down to [both feet].

15

(Tr. at 305-06).  She also testified that she sometimes uses a cane to help her walk, but stated that she was not currently using a cane because she "lost the tip" and it became unstable.  (Tr. at 306).  Onezine testified that she continues to suffer from daily neck pain, that holding her head up for a long time causes pain in her chest muscles, that her pain travels down her arms, and that it feels like an "[e]lectrical shock."  (Tr. at 307).  She reported that she takes medication for her pain, but that it does not help much, and "always make[s her] go to sleep."  (Tr. at 308).  Onezine also testified about her physical abilities, stating that she can lift and carry no more than five to ten pounds, that she can stand for only five to eight minutes before experiencing back spasms, that she can only walk "part of a block," and that she can sit for no more than thirty minutes at a time.  (Tr. at 313-14).  In addition, she testified that she lies down for the equivalent of half of an eight-hour work day.  (Tr. at 308).  Onezine further testified that she has a "trigger finger," a condition in which the middle finger of her left hand is bent so that if she straightens it out, it folds back.[14]  (Tr. at 309).  She also stated that her hands "tingle a lot and they go dead," and that she "can't grip anything because . . . they just die, become numb."  (Tr. at 314).  Onezine then testified that, as a result of her condition, she rarely writes, she has difficulty getting dressed, and she no longer bathes, does home repair or yard work, goes grocery shopping, cooks, or drives. (Tr. at 315-16).  She testified that she does go to church, but that it is an informal church and she can lie down on the floor if she must do so.  (Tr. at 317).

Onezine also testified about her depression.  She stated that, at the time of the hearing, she was being treated by a psychiatrist twice a month for "major depression."  (Tr. at 310).  She testified that, as a result of her depression, she is "short-tempered"; she feels "sad all the time,"

---

[14] Onezine testified that she is right handed.  (Tr. at 302).

helpless, and hopeless; she cries more than once a week; she has trouble sleeping; she has difficulty focusing; and she seems to have lost friends. (Tr. at 310-12). She also testified that once she "realized that [she] was constantly in pain all the time," she "[f]elt like [her] life was over," and she stopped doing "anything," including going to the movies, the park, or the store, or even sewing. (*Id.*). When questioned by the ALJ, Onezine stated that she does not have difficulty being around strangers, but that she avoids crowds because she feels that people are "looking down" on her. (Tr. at 319-20).

### *Expert Testimony*

At the hearing, the ALJ also heard from Susan Rapant, a vocational expert witness, who testified based on her review of the record. (Tr. at 324). The following exchange took place between Ms. Rapant and the ALJ:

> Q      [A]ssume with me a person of the same age, same education, same vocational background of the claimant, and further assume with me the following. Hypothetical number one, this person could sustain work at the level of light as that term is defined by the . . . Dictionary of Occupational Titles. However, this person would be restricted in the use of the non-dominant hand, where it could be only used for a pinching maneuver between the index finger and the thumb, and that it can only occasionally be used in that regard. This person cannot be required to climb ropes, ladders, or scaffolds. This person could do detailed, but not complex tasks. This person can have no public contact, other than incidental contact. The work would have to be done at a non-assembly line pace.
>           Could such a hypothetical person perform any of the claimant's past work?
>
> A      No, Your Honor.

*   *   *

> Q      Okay.  Would there be any jobs that such a person could perform in the national economy?
>
> A      Yes, Your Honor.  There would be, her skills would transfer to her job as a companion, which is light, semi-skilled work.

17

Q What skill would transfer?

A Medical terminology, her experience taking care of patients, the medical training that she's had would make her marketable for the job as a companion.

Q Numbers?

A The numbers . . . would be 1,500 in the area, and in the national economy, 185,000.

Q Any other jobs?

A There would be light, unskilled work.

Q Examples?

A An example would be a ticket taker.

*   *   *

Another example would be an office helper, and the numbers for that job in the area would be 1,000, and 190,000 in the national economy. . . . The job as an office cleaner, and the numbers for that job would be 1,300 in the area, and 250,000 in the national economy. And the third example would be a mail clerk, and the numbers for that job would be 1,400 and 290,000 in the national economy.

Q Hypothetical number two, same as hypothetical number one, but then add, say this person would need four unscheduled breaks a day for 15 or 20 minutes each. Any jobs?

A No, Your Honor, not at the unskilled level. Most employers aren't gonna [sic] tolerate that many breaks.

Q How about the companion job?

A I would say no. I'm sure on some days, that could work, but when you're a companion, . . . your job is to assist somebody. So, if you have an unscheduled break and they need assistance at that time, you're not gonna [sic] be effective.

(Tr. at 328-30). Ms. Rapant also testified that Onezine could be an instructor if she did not have difficulty with the "public contact" aspect of such a position. (Tr. at 331-32). She further

18

testified that if the use of a cane was added to the first hypothetical, she would eliminate the position of companion and office cleaner, and that the number of office helper and mail clerk jobs available would decrease by up to eighty percent.  (Tr. at 333).  She added, however, that such a person could also perform a sedentary job such as a surveillance system monitor, a job which is available in significant numbers in both the local and the national economy.  (Tr. at 334).  Finally, Ms. Rapant testified that if a person with Plaintiff's vocational profile, age, education, and past work experience was required to lie down for half of an eight-hour work day, because of the side effects of pain medication, she would not be able to perform any competitive work on a full-time basis.  (Tr. at 331).

### The ALJ's Decision

Following the hearing, the ALJ made written findings on the evidence.  From his review of the record, he determined that Onezine suffers from severe degenerative disk disease, "trigger finger of the nondominant hand," hypertension, obesity, and depression.  (Tr. at 16).  He also found, however, that Onezine's alleged neck pain does not qualify as a severe impairment.  (Tr. at 17).  He then determined that Onezine does not have an impairment, or any combination of impairments, which meet, or equal in severity, the requirements of any applicable SSA Listing. (*Id.*).  Next, the ALJ found that Onezine is unable to perform her past relevant work, but that she does have transferable skills from past positions.  (Tr. at 20).  The ALJ then concluded that Onezine is capable of performing a significant number of jobs which exist in the local, regional, and national economy, including office helper, companion, or office cleaner, and so she is "not disabled," under the Act.  (Tr. at 17-22).  That denial prompted Onezine's request for judicial review.

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496). Any conflict in the evidence is to be resolved by the ALJ, and not the court. *See id*. A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision. *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).

Plaintiff argues that the ALJ erred because he did not follow the relevant law when he assessed her residual functional capacity. (Plaintiff's Motion at 3). In addressing this issue, she also complains that the ALJ's findings are not consistent with the Dictionary of Occupational Titles. (*Id*.). In his decision, the ALJ found that Onezine has "the residual functional capacity to perform a wide range of work at the light exertional level," including work as an office helper, an office cleaner, or a companion, as defined by the DOT. (Tr. at 17, 21).

Plaintiff first points out that, in determining whether a claimant is eligible for benefits, the ALJ is required to consider whether she would be unable to perform substantial gainful activity for more than 12 months because of a medically determinable impairment. *See* 42 U.S.C. § 1382c(a)(3)(A). In her motion, however, Onezine argues that, as part of that consideration, that the ALJ was required to determine whether she was capable of "maintaining[] employment for a significant period of time." (Plaintiff's Motion at 6). The Fifth Circuit has stated that such a finding is not necessary unless the claimant's impairments are shown to "wax and wane" in severity. *See Perez v. Barnhart*, 415 F.3d 457, 465 (5th Cir. 2005); *Dunbar v. Barnhart*, 330 F.3d 670, 671 (5th Cir. 2003); *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003). Here, there

is no suggestion that the severity of Onezine's impairments "wax[es] and wane[s]," so the ALJ committed no error in this regard.

　　　She also complains, however, that, when assessing her RFC, the ALJ did not take into account the following conditions: neck pain, "edema in the lower extremities"; fibromyalgia; and "mental limitations." (Plaintiff's Motion at 5-7). In determining a claimant's RFC, the ALJ is required to evaluate the combined effects of her impairments. *See Fraga*, 810 F.2d 1305. Onezine first claims that the ALJ did not "consider [her] neck pain." (*Id.*). But, to the contrary, the first of Onezine's complaints that the ALJ addressed was her "neck pain." (Tr. at 17). As to this impairment, the ALJ found that "there is no objective medical evidence that supports the claimant's allegations" of debilitating neck pain. (*Id.*). A review of the record supports this finding. Indeed, evidence that she complained to medical professionals about neck pain is sparse. On August 14, 2003, a few days after her pain-causing injury, and at one subsequent appointment, Onezine complained to Dr. Williams about neck pain, along with back and leg pain. (Tr. at 227, 232). Later, Dr. Williams reported that Onezine obtained pain relief from medication. (Tr. at 227). It is well-settled that to prevail on a disability claim, a claimant must show that she "would be disabled with or without regular medical treatment." *Villa*, 895 F. 2d at 1024. If medication relieves pain to a mild or even a moderate level, then that pain does not render a claimant disabled. *See Falco*, 27 F.3d at 163; *Richardson v. Bowen*, 807 F.2d 444, 448 (5th Cir. 1987). The record also shows that when she saw Dr. Arthur, a pain specialist, on December 11, 2003, Onezine did not complain of neck pain, but only of pain in her back and legs. (Tr. at 201). The next suggestion of neck pain is from July 14, 2005, when Onezine complained to Dr. El-Serag of the V.A. Medical Center of "chronic back pain . . . from neck to

low back." (Tr. at 270-79). The doctor ordered x-rays of her neck and back, and found no abnormalities aside from "marginal" bony outgrowths. (Tr. at 278-79). A follow-up examination showed that Onezine had a good range of motion in her neck. (Tr. at 260). In another V.A. Medical Center record, dated January 19, 2006, Ms. Vigil, the physician's assistant, stated that Onezine suffered from neck pain, but added that the pain was "fairly well controlled" with pain medication. (Tr. at 238). Under these circumstances, it is clear that the ALJ addressed Onezine's complaints of neck pain, and that his conclusion is well supported with medical evidence in the record.

Plaintiff argues, as well, that "[t]he ALJ totally failed to consider what limitations would arise from the diagnosis [sic] of fibromyalgia [and] edema in the lower extremities." (Plaintiff's Motion at 6-7). However, in her application, Onezine did not claim that she was disabled as a result of these impairments. (Tr. at 82, 16). Further, the only mention in the record of fibromyalgia is Dr. Williams' suggestion, on August 3, 2004, that Onezine may need to see a specialist to rule out that disorder. (Tr. at 229). Onezine does not point to any evidence that she was diagnosed with fibromyalgia. Moreover, the ALJ did address signs of edema. (Tr. at 17).

Plaintiff also claims that "the ALJ did not address [her] mental limitations fully." (Plaintiff's Motion at 5-7). Actually, however, the ALJ discussed her mental state in detail. (Tr. at 17-20). For example, he pointed to Dr. Partida's report on March 9, 2006, in which she found that Onezine was responding well to treatment and was not experiencing significant side effects from her anti-depressant medication. (Tr. at 291-93). In addition, he noted that, in 2003, Dr. Carlyle found that Onezine had a normal mood and affect. (Tr. at 215). The ALJ also pointed to Onezine's testimony and to records from the V.A. Medical Center, from 2005 and 2006, that

22

show that she socializes with family members, generally gets along with other people, regularly attends church, and reads and watches TV without difficulty. (Tr. at 253, 291, 317-20). And he also noted that the same evidence indicated that any mental problems appeared to be controlled by medication. (*Id.*). In his decision, the ALJ found Onezine to be "moderately limited in the area of persistence and pace," but noted that such limitations are eliminated when she takes her anti-depressant medication. (Tr. at 19). Further, he found that Onezine is only moderately limited in her social functioning. (*Id.*). However, despite these findings, the ALJ concluded that Onezine "should have only incidental contact with the public," and that her "work should be performed at a nonassembly-line pace." (Tr. at 17). It is clear, then, that the ALJ considered all of Onezine's claimed impairments, both physical and mental, when he assessed her RFC, in accordance with the law.

In her motion, Onezine also complains that the ALJ's finding that she can perform the jobs of office helper, companion, or office cleaner is not consistent with the DOT. She first claims that the DOT description of "office helper" includes "frequent interaction with the public and co-workers," while the ALJ found that she should be limited to "incidental" contact with the public. (Plaintiff's Motion at 7). However, the DOT description of office helper suggests only that she would encounter co-workers—not the public at large. *See* DICTIONARY OF OCCUPATIONAL TITLES, Code 239.567-010. Additionally, Onezine claims that "[t]he job pace is . . . determined by the speed of machinery which is not consistent with the ALJ's requirement that the work not be at an assembly line pace." (Plaintiff's Motion at 7). But she points to nothing in the job description that indicates that it involves work "at an assembly line pace." (*See id.*). Onezine also claims that the job of "office cleaner" is not listed in the DOT. (*Id.*). However,

Ms. Rapant, the vocational expert witness, testified that the position falls under section 323.687-014 of the DOT, which addresses the job of "Cleaner, Housekeeping (Any Industry)." (Defendant's Response at 3). The DOT characterizes such jobs as unskilled and requiring only a light level of exertion. (*Id.*). Finally, Onezine contends that the job of "companion" involves more than incidental contact with the public, and "require[s] more patience and ability to be supportive than Ms. Onezine could provide when she herself is dealing with [severe impairments]." (Plaintiff's Motion at 8). However, the DOT description of the position suggests contact primarily with the employer. *See* DICTIONARY OF OCCUPATIONAL TITLES, Code 309.677-010. Plaintiff has not shown that the ALJ's findings are inconsistent with the descriptions listed in                                      the                                      DOT.

Plaintiff's other complaint is that the ALJ did not follow the law when he determined that she was "not credible." (Plaintiff's Motion at 9). In fact, the ALJ found that her testimony was not "entirely" credible. (Tr. at 17-20). It is true that in any disability determination, the ALJ "must consider a claimant's subjective symptoms as well as objective medical evidence." *Wingo v. Bowen*, 852 F.2d 827, 830 (5th Cir. 1988). But there is no question that an ALJ has discretion to weigh the credibility of the testimony presented, and that his judgment on what weight to ascribe to it is entitled to considerable deference. *See Villa*, 895 F.2d at 1024. An ALJ may accept or reject a claimant's subjective statements, so long as the reasons for so doing are made clear. *See Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). For example, he may find that the claimant's subjective complaints are "not credible," or he may find the medical evidence to be "more persuasive than the claimant's own testimony." *Id.* A claimant's subjective complaints "must be corroborated at least in part by objective medical testimony." *Houston v. Sullivan*, 895

F.2d 1012, 1016 (5th Cir. 1989) (citing *Harrell*, 862 F.2d at 481); *accord* 20 C.F.R. §§ 404.1528(a), 404.1529.  If there are conflicts between a claimant's subjective complaints and the objective medical evidence, the ALJ must evaluate the claimant's credibility.  *See* 20 C.F.R. § 404.1529; *Hollis v. Bowen*, 837 F.2d 1378, 1385 (5th Cir. 1988).  In doing so, the ALJ must consider such factors as stated activities of daily living, current treatment, medication and any side effects, or other methods of alleviating pain, to determine the limiting effects of any impairment or symptomology on the claimant's ability to work.  *See* 20 C.F.R. § 404.1529; *Hollis*, 837 F.2d at 1385.

In this case, Plaintiff claims that the ALJ's decision "constitutes no more than conclusions unsupported by any specific rationale or specific reasoning other than that [she] is not credible."  (Plaintiff's Motion at 10).  A review of the decision, however, shows that the opposite is true.  First, the ALJ explained that he could not find Onezine's neck pain to be severe because "there is no objective medical evidence that supports [her] allegations" of neck pain. (Tr. at 17).  Notably, as detailed previously, this finding is also fully supported by the objective medical evidence.  (*See, e.g.*, Tr. at 201 [Dr. Arthur], 227-232 [Dr. Williams], 238 [Ms. Vigil], 270-79 [Dr. El-Serag]).  Next, the ALJ addressed Onezine's credibility when he assessed her RFC.  (Tr. at 17-20).  He first set out, in detail, the impairments Onezine alleges and the extent to which she believes herself to be limited by them.  (Tr. at 17-18).  He then made specific references to objective evidence that calls Onezine's subjective complaints into question.  (Tr. at 18-20).  He first referred to a report from December, 2003, in which Dr. Williams noted that Onezine walked without assistance and had no significant loss in her range of motion.  (Tr. at 202).  Next, the ALJ pointed to a report from April, 2005, which found Onezine to have a normal

gait, normal strength in her lower extremities and no signs of sensory deficits. (Tr. at 280). He then noted that, between July and December, 2005, Dr. El-Serag and Ms. Vigil examined Onezine and found no disturbances in gait or station, no loss of range of motion in her joints, a negative straight leg raise test result, and no signs of sensory or neurological deficits or fatigue. (Tr. at 260, 270). The ALJ also pointed to reports by Dr. Carlyle, Dr. Parish, and Ms. Vigil which indicate that Onezine's pain might not be as severe as she alleged. (Tr. at 215, 238, 286). In addition, he noted that, on March 15, 2006, Onezine reported that her back pain rated only a "4" out of ten, that her comfort level was "2," and that she considered her current pain level to be "acceptable." (Tr. at 286). Further, the ALJ cited evidence that Onezine's condition was being controlled through therapy or medication. (Tr. at 238 [Ms. Vigil], 277 [Dr. Williams]). Moreover, the ALJ pointed to Plaintiff's own testimony that, at the time of the hearing, she was not using a cane to walk. (Tr. at 306). The ALJ then stated that none of this evidence is consistent with Onezine's allegations of difficulty walking, sitting, and standing. (Tr. at 18). He stated, instead, that this evidence shows that Onezine should be able to walk and "to sit and stand without significant limitations." (*Id.*). Further, the ALJ pointed to the specific evidence that showed that Onezine's mental impairments were not as limiting as alleged. (*See, e.g.*, Tr. at 215 [Dr. Carlyle], 253 [Dr. El-Serag], 291-93 [Dr. Partida], 317-20 [Onezine]). And he noted that, as recently as March, 2006, Onezine's mental condition was reported to be controlled by medication or therapy. (*See, e.g.*, Tr. at 291-93). The ALJ stated, as follows:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible.

26

(Tr. at 18). He concluded that, because her testimony regarding symptoms and limitations was not fully credible, "greater probative weight is given to the objective medical evidence in determining [her RFC]." (Tr. at 20). In this case, then, the ALJ gave specific reasons for his determination that Onezine's statements were "not entirely credible," and there is ample evidence to support his conclusion that her limitations are not as severe as she alleged. Under these circumstances, his finding that Plaintiff's subjective complaints were not fully credible need not be disturbed. *See* 20 C.F.R. § 404.1529; *Hollis*, 837 F.2d at 1385.

In sum, the ALJ's decision to deny disability benefits to Onezine was supported by substantial evidence, and was rendered in accordance with the law governing her claim. For that reason, the ALJ's determination that Plaintiff is not disabled and his consequent denial of disability benefits should not be disturbed.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED**, and that Plaintiff's Motion for Summary Judgment be **DENIED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have ten business days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 02-13, S.D. Texas. Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas, 77208; copies of any such objections shall be delivered to the

chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

     **SIGNED** at Houston, Texas, this _____ day of August, 2008.

                          _____
                                   **MARY MILLOY**
               **UNITED STATES MAGISTRATE JUDGE**